**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHARLES RANDLE, | |
|        Plaintiff, | No. 18 CV 7890 |
|     v. | Judge Manish S. Shah |
| WALTER NICHOLSON, et al., | |
|        Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charles Randle was an inmate at Stateville Correctional Center when he fell out of the top bunk bed. Randle had a low-bunk permit, which he says Stateville's correctional officers did not honor. He brings this suit under 42 U.S.C. § 1983 against the officers, Terrell Pork, Michael Bubash, and Ovidiu Botan, for being deliberately indifferent to the risk of injury from falling in violation of the Eighth Amendment. After the fall, he claims that Stateville's warden, Walter Nicholson, ignored his requests for medical care. The IDOC defendants move for summary judgment. Randle also brings a claim against medical professionals at Stateville for providing him with constitutionally inadequate medical care. The medical defendants—Wexford Health Sources, Inc., Dr. Evaristo Aguinaldo, Dr. Christian Okezie, and La Tanya Williams—move for summary judgment. For the reasons discussed below, both motions are granted.

## I. Legal Standards

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party … [and] [t]he substantive law of the dispute determines which facts are material." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (internal citations omitted). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

## II.   The Parties

Correctional Officer Michael Bubash is a named defendant in Randle's fifth amended complaint, but Bubash was never served. [65]; [190] ¶ 6.[1] The IDOC defendants move to dismiss Bubash as a defendant. [176] at 1 n.1. Randle does not object or offer any argument in support of maintaining any claim against Bubash. Although dismissal for failure to serve is ordinarily without prejudice, here, Randle's decision not to oppose dismissal demonstrates his intent to abandon any claim against Bubash. Bubash is dismissed with prejudice.

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page numbers. Facts are taken from plaintiff's responses to defendants' Local Rule 56.1 statements, [180] and [190], and defendants' responses to plaintiff's statement of additional facts, [182] and [196], where both the asserted fact and response are sent forth in one document. An asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see, e.g.*, [180] ¶¶ 27–33. The parties dispute many facts, but most of the facts in those disputes are not material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include them in the light most favorable to plaintiff.

Randle sues David Gomez in his official capacity for injunctive relief as the warden of Stateville Correctional Center. [95] ¶ 9. Gomez was not the warden at the time of the disputed incidents. [190] ¶ 3. Defendant Walter Nicholson was warden during the alleged incidents. *Id.* ¶ 2. The current warden of Stateville is Charles Truitt, but Randle is no longer incarcerated at Stateville. *Id.* ¶¶ 1, 17. Randle's request for injunctive relief from Stateville's warden is moot. *See Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009) (holding that an inmate's transfer from the complained-of prison generally moots equitable relief). Charles Truitt is dismissed.

At issue is the liability of the following defendants: Wexford Health Sources,[2] Dr. Evaristo Aguinaldo, Physician's Assistant La Tanya Williams, Dr. Christian Okezie, Sergeant Terrell Pork, Sergeant Ovidiu Botan, and Warden Walter Nicholson.

## III. Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). In their briefs, parties must cite to specific statements of fact in the Local Rule 56.1 statements or responses, not directly to the record. *See* N.D. Ill. Local R. 56.1(g); *Mervyn v. Nelson Westerberg, Inc.*, 142 F.Supp.3d 663, 666 (N.D. Ill. 2015) ("Local Rule 56.1 statements and responses establish the bridge between the record and the parties' arguments, and the value of those statements and responses is

---

[2] Wexford Health Sources, Inc. is named as a defendant in connection with Randle's request for injunctive relief. [95] ¶ 10. A plaintiff seeking injunctive relief under 42 U.S.C. § 1983 may name the party responsible for ensuring that any injunctive relief is carried out. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

largely lost if the parties' briefs ignore them and instead cite the record."). Randle violates this rule in both his response briefs. *See* [178] and [191]. There is not a single citation in either brief to the Rule 56.1 statements and responses. Despite this rule violation, I exercise my discretion to consider the cited material.

Charles Randle is not a medical professional. [180] ¶ 1. The Wexford defendants contend that this bars him from opining on the medical treatment he received. [181] at 4. Without any medical expert testimony, Randle is limited in the topics he may opine on as a lay witness. *See James v. Eli*, 889 F.3d 320, 328 (7th Cir. 2018) (noting that expert medical evidence is often required to prove that medical treatment constituted a substantial departure from accepted medical judgment, practice, or standards). But Randle may speak on matters within his personal knowledge, including details about his injury and his interactions with defendants. *See* Fed. R. Evid. 602.

Nor does it matter that Randle's testimony is self-serving. A plaintiff's self-serving testimony is admissible so long as it is based on personal knowledge. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving… [T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (internal citations omitted); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). I overrule the Wexford defendants' objections to Randle's deposition testimony. *See* [182] ¶¶ 4, 12, 15.

Randle also relies on his emergency grievances dated June 30, 2018, to establish what the officers knew about his low-bunk permit and threats made to his safety by an officer during his cell transfer. [196] ¶¶ 6–10, 13; [191] at 11–12. The IDOC defendants object to his grievances as unsworn and inadmissible hearsay. Randle affirmed during his deposition that he wrote and signed the grievances on the dates specified, effectively adopting them under oath. *See* [191-1] at 97:21–99:20. While his grievances are hearsay, his deposition testimony suffices to make their content admissible as matters within his personal knowledge or admissions by a party-opponent (statements made by defendant officers). *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) ("The evidence need not be admissible in form, but must be admissible in content.").

Randle cites to his fifth amended complaint to establish that (1) the pain after his fall prevented him from eating and sleeping and (2) he begged Warden Nicholson during the warden's tour of X-House for medical assistance. *See* [196] ¶¶ 11, 15. At the summary judgment stage, Randle may not rely solely on his complaint to establish a material factual dispute. *See* Fed. R. Civ. P. 56(c)(1)(A); *see also Gross v. Peoples Gas Light & Coke Co.*, 634 F.Supp.3d 464, 476 (N.D. Ill. 2022) ("Since an unverified complaint is a pleading, Fed. R. Civ. P. 7(a)(1), [c]itations to the complaint do little, if anything, to show the absence of any genuine issue of material fact.") (internal quotation marks omitted). I disregard Randle's assertions of fact that rely on his fifth amended complaint.

Randle relies on several secondary sources: an article in the Journal of Forensic and Legal Medicine on injuries associated with bunk beds in prisons; a webpage on "Fall Protection" by the Occupational Safety and Health Administration; and an online article published by Johns Hopkins Medicine comparing CT scans, MRIs, and x-rays. [182] ¶¶ 1, 3, 13–14; [196] ¶¶ 1, 3. These documents lack foundation and are inadmissible hearsay, so I sustain defendants' objections and disregard them. *See* Fed. R. Evid. 602, 801(c). Randle also cites to the Consumer Product Safety Commission's regulations on bunk beds, which defendants object to as immaterial. Randle argues that the fact that the federal guidelines on bunk beds are inapplicable to prison bunk beds "should have made IDOC defendants hyper-aware that inmates were more likely than the remainder of the population to suffer injuries from such beds." [191] at 4. The agency's regulations do not support the assertion that the IDOC defendants personally knew about Randle's risk of falling from the bunk bed. I disregard the regulations as immaterial.

## IV. Facts

Charles Randle was an inmate at Stateville Correctional Center in the custody of the Illinois Department of Corrections. [180] ¶¶ 1–2; [190] ¶ 1. Dr. Christian Okezie issued Randle a low-bunk permit valid from June 5, 2018 until December 4, 2018. [196] ¶ 4. Under the section of the permit for "Absolute Criteria for Low Bunk Permit," the condition "Hernia" was written in by Dr. Okezie.[3] [191-1] at 424. On

---

[3] The parties do not otherwise develop any facts as to how Randle's hernia condition was related to the issuance of the low-bunk permit.

June 28, Randle was transferred to X-House (segregation). [196] ¶ 5. Randle told Sergeant Terrell Pork that he had a low-bunk permit. *Id.* ¶ 6. Sergeant Pork, who oversaw daily operations of the unit, responded, "That permit means nothing in X-House." *Id.* ¶¶ 6, 16. Pork was responsible for verifying inmates' medical permits with the medical section and storing permits in a logbook. *Id.* ¶ 17.

Randle told Dr. Hart, a Wexford mental health professional, that Pork was going to place him in the cell despite his low-bunk permit. [196] ¶ 7. Randle objected to being placed in a cell with a cellmate who also had a low-bunk permit. *Id.* Dr. Hart told Randle that Pork was not permitted to put the inmates together and that she would look into the issue. *Id.* Despite his request, officers escorted Randle to the cell. *Id.* ¶ 8. Correctional officers were responsible for placing inmates in cells. *Id.* ¶ 18. Officers would inform Sergeant Pork when a placement was complete. *Id.* Randle asked Officer Michael Bubash if he could place his mattress on the floor, but the Bubash responded that it would be a safety and security issue. *Id.* ¶ 9.

The morning of June 29, Randle fell out of the top bunk bed. [180] ¶ 11. Randle says that he fell unconscious and other inmates screamed for medical attention on his behalf.[4] [196] ¶¶ 13–14. When he regained consciousness, Bubash and another officer saw him in his cell and Bubash told him he was faking it. *Id.* ¶ 14. Randle was

---

[4] The parties dispute what happened immediately after Randle's fall. The Wexford defendants dispute Randle's description as unsupported by the medical evidence. [182] ¶ 4. The IDOC defendants dispute that Randle could not be unconscious and hear statements of other inmates at the same time. [196] ¶ 13. It's not obvious that this is a factual impossibility, and it's within Randle's personal knowledge to recount what happened after he fell from the top bunk. I credit Randle's testimony and overrule defendants' objection.

taken to the health care unit in a wheelchair the same morning of his fall.[5] [180] ¶ 12; [182] ¶ 4. A nurse evaluated Randle. [180] ¶ 12; [182] ¶¶ 8–9. He reported falling out of his bed and hurting his head, back, and leg.[6] [180] ¶¶ 11–12. He was evaluated for back pain and prescribed Tylenol. *Id.* ¶ 11. A follow-up with a doctor was scheduled for July 3. *Id.*

The day after his fall, Randle declared a hunger strike. [180] ¶ 13. The same day, he filed an emergency grievance to the warden describing his transfer to X-House, the officers' refusal to honor his low-bunk permit, and his fall from the top bunk. [196] ¶ 22; [191-1] at 188–89. The grievance was reviewed and deemed a non-emergency. *Id.* The next day, he was seen by medical staff according to the hunger-strike protocol. [180] ¶ 14. Randle told staff he was on a hunger strike because he was being denied medical treatment. *Id.* ¶ 14. He had no complaints or allergies recorded on his medical file at this appointment. *Id.*

On July 2, Randle was seen by Dr. Evaristo Aguinaldo. [180] ¶ 15. The parties dispute what complaints Randle reported to Dr. Aguinaldo.[7] [180] ¶ 15; [182] ¶ 10.

---

[5] Randle asserts that he was forced to get up on his own because Nurse Wendy told him to get up. [180] ¶ 12. Nurse Wendy was dismissed as a defendant. [17].

[6] Randle asserts that the Offender Injury Report reflects Randle injured his head, back, and leg from the fall. [180] ¶ 9; [178-1] at 159–60. Defendants object to this characterization and assert that the nurse only recorded Randle's statements; her evaluation was for back pain. The record shows that the nurse recorded Randle's statements, but it does not support the assertion that Randle sustained a head, back, and leg injury as a matter of medical injury.

[7] Randle asserts that he also told Dr. Aguinaldo about the pain in his back, neck, and head, but Aguinaldo only ordered an x-ray for his lower back. [182] ¶ 10. Randle cites to his deposition testimony, but the cited portions do not support the assertion that Randle reported feeling pain in his neck or head to Dr. Aguinaldo. Randle testified that Dr. Aguinaldo knew he had fallen from the top bunk and suffered a head injury. *See* [191-3] at 52:14–58:10 ("Q. And you also told him that you had some pain in your lower back, correct? A. Because of the

The medical record shows that Randle reported being on a hunger strike and was evaluated with low-back trauma. *Id.* Dr. Aguinaldo ordered an x-ray for Randle's low back and prescribed him an analgesic balm. *Id.* He was ordered for a follow-up to review his results. *Id.* Three days later, Randle had the low-back x-ray performed, which found localized narrowing of the L5-S2 disc reflecting degenerative disc disease with arthritic spurring. [180] ¶ 16. The x-ray was otherwise negative for other conditions. *Id.*

On July 9, PA Williams saw Randle for his hunger-strike protocol. [180] ¶ 17. Randle told Williams that his lower back was hurting. *Id.* Williams noted that there was no acute distress. *Id.* Williams advised Randle to resume eating and referred him to the medical director. *Id.*

On July 12, medical staff saw Randle for chest pain. [180] ¶ 18. He was scheduled to see a nurse the next day. *Id.* The next day, Randle saw a nurse for his hunger-strike protocol. [180] ¶ 19. He told the nurse, "I'm ok. I feel tired." *Id.* He complained of not receiving adequate medical treatment. *Id.* He reported his last

---

fall off the top bunk, yes. Q. And he ordered an x-ray of your lower back, correct? A. Correct, but I must put on the record he knew of the fall at the top bunk. He ordered x-rays for the lower back, not the upper extremities or the entire. He knew to my knowledge that he did not take x-rays of anything else. He ordered those. He knew about the fall on the top bunk. He knew about my head injuries, and that's one of the issues I was raising in my complaint as well that he did not follow the safety protocols of the fall off the top bunk for the head injuries.") & 58:23–59:7 ("Q. I didn't ask for lower back x-rays. That's what he ordered when he knew that I suffered head injuries. I didn't ask him to order back x-rays. I was being under his care, and that's what he ordered, not me. He knew that I fell off the top bunk and suffered head injuries. So he made that call, not me. That was his doctor decision. I ask for medical attention from the fall off the top bunk due to the head injuries and back pain."). The record does not show that Randle complained about neck or head pain to Dr. Aguinaldo at the July 2nd appointment.

9

meal was on June 30 and was taking Motrin. *Id.* He was ordered to follow-up with a doctor. *Id.*

On July 16, Randle saw PA Williams and a nurse for a physical exam and hunger-strike physical. [180] ¶ 20. Randle's physical exam was normal. *Id.* Williams referred him to the medical director. *Id.*

Four days later, Randle saw Dr. Okezie for back pain and neck pain.[8] [180] ¶ 22. Randle says that he told Dr. Okezie about a lump on his head after the fall and that Dr. Okezie ignored the problem and told him he would only assess Randle's foot. [182] ¶ 12. The medical record shows that Randle had a normal physical exam with "mild dehydration, no hematoma, no abrasions, and no bruises." [180] ¶ 22.

Randle saw Dr. Okezie again on August 8. [180] ¶ 24. Dr. Okezie reviewed Randle's x-rays, which revealed degenerative disc disease at discs L5 and S1. *Id.* Dr. Okezie granted Randle a medical permit for an extra mattress, low gallery, and a waist chain to accommodate his complaints of pain. *Id.*

On August 22, Randle saw P.A. Williams, who made no acute findings on examination. [180] ¶ 25. He sought an external appointment for his hernia and validity for a low-bunk permit.[9] *Id.* There were no findings for lower back or head

---

[8] The parties dispute whether this was the first time Randle reported having neck pain. Randle asserts that he had told P.A. Williams and Dr. Aguinaldo about neck pain. As discussed above, the cited portions of Randle's testimony, [178-1] at 57, do not establish that he complained of neck pain to Dr. Aguinaldo. And Williams's declaration does not state that Randle reported neck pain during a visit with her; the cited portion is her review of Randle's initial evaluation with the nurse on the morning of the fall. *See* [155-5] at 2 ("[Randle] reported that he fell out of his bunk and hurt [his] head, back, and leg" on June 29.").

[9] Randle objects to the reference to his hernia condition as immaterial. Because Randle is challenging the adequacy of medical care Williams provided, the treatment Williams

pain. *Id.* Williams advised him about an external appointment scheduled with the University of Illinois hospital, ordered him to continue his appointment with the medical director the next day, and return as needed. *Id.*

Randle initially brought this suit pro se in November 2018 alleging violations of the Eighth Amendment under 42 U.S.C. § 1983. [1]. He filed a fifth amended complaint with the assistance of counsel. [95]. After two motions to dismiss, *see* [88] *and* [118], two counts remain: (1) a claim of deliberate indifference against Warden Nicholson, P.A. Williams, Dr. Aguinaldo, and Dr. Okezie and (2) a claim of deliberate indifference against Sergeants Terrell Pork and Ovidiu Baton.[10] *Id.*

## V.  **Analysis**

The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate (1) there was "a risk of harm to the plaintiff that is so objectively serious as to be excessive;" (2) the defendant knew of the risk; (3) "the defendant's

---

provided during this visit is relevant to whether she appropriately responded to his medical needs.

[10] The court previously dismissed Count II of the fourth amended complaint as to Warden Nicholson, which was based on the IDOC defendants' failure to honor Randle's low-bunk permit before the fall. *See Randle v. Nicholson*, No. 18 C 7890, 2020 WL 7319572, at *3 (N.D. Ill. Dec. 11, 2020) ("[N]o allegations appear in the complaint suggesting that Randle told Nicholson about his low bunk permit prior to the fall… Nicholson could not have disregarded the risk that Randle could have fallen out of his bed."). The court found that Randle's fifth amended complaint did not cure the deficiency. *See* [118] at 1. Nicholson remains a defendant in the case only as to Count I.

response to the risk [was] so inadequate as to constitute disregard of (or deliberate indifference toward) the risk;" and (4) the defendant's deliberate indifference caused the plaintiff's injury. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023).

### A. Wexford Defendants

#### 1. *Objectively Serious Medical Condition*

The parties disagree on what injuries Randle suffered from his fall. Randle says his fall from the top bunk bed caused unconsciousness, numbness in his legs, swelling on the back of his head, and pain in his head, neck, and back. [178] at 3. Defendants argue that the medical records do not support Randle's assertion that he sustained head and neck injuries nor that he complained of head and neck pain to defendants. [154] at 5. They say that Randle only reported his back pain and was prescribed pain medications. Defendants say this shows his pain was only intermittent because medications managed any pain. *Id.* They also point out that Randle's ultimate diagnosis after the x-ray was arthritis in his back, which is a normal consequence of aging. *Id.* at 5. Defendants say plaintiff—without expert witness testimony—cannot as a lay witness opine on his on the type of pain that mandates treatment. *Id.* at 5–6.

An objectively serious medical condition is one that has been diagnosed as requiring medical treatment or "one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). The Wexford defendants explain that a nurse triaging a patient decides if the patient would benefit from seeing a physician and can place the patient on the schedule for a follow-up appointment. [180] ¶ 10. It's undisputed that Randle fell from

the bunk, which at least resulted in unconsciousness and reports of back pain. Medical staff clearly believed Randle's fall required medical attention—he was taken in a wheelchair to the health care unit the morning of his fall and the treating nurse scheduled a follow-up with a doctor after evaluating Randle. *Id.* ¶¶ 11–12. A reasonable jury could find that whatever injuries he suffered, Randle's fall caused an objectively serious medical condition.

### 2. *Deliberate Indifference*

To satisfy the subjective element of an inadequate medical care claim, Randle must show that P.A. Williams, Dr. Aguinaldo, and Dr. Okezie knew of the risk of harm caused by his fall but disregarded it. *See Pyles*, 71 F.3d at 409. "Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). A medical professional's treatment of an inmate may be deliberately indifferent if they "choose[] an easier and less efficacious treatment without exercising professional judgment." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citation omitted). "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

Randle raises three aspects of his treatment to assert deliberate indifference: delays in treatment, decisions to pursue less effective treatments, and failure to follow a concussion protocol. [178] at 7–14. Because a claim under § 1983 is predicated

on individual liability, *see Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), I look at each defendant's role in Randle's medical treatment.[11]

Dr. Aguinaldo's first and only appointment with Randle was three days after his fall on July 2, 2018. [180] ¶ 15. That day, Dr. Aguinaldo ordered an x-ray of Randle's lower back. [180] ¶ 15; [182] ¶ 11. The x-ray was taken four days later. *Id.* There's no evidence that the six-day delay between Randle's fall and the x-ray harmed Randle or unnecessarily prolonged his pain. Dr. Aguinaldo ordered the x-ray on the same day he saw Randle. While he had the authority to order an x-ray, he was not responsible for scheduling it. *Id.* ¶ 11. Dr. Aguinaldo also prescribed Randle an analgesic balm for his back pain the same day. Randle's delay in receiving the x-ray does not reflect deliberate indifference on Dr. Aguinaldo's part. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002*)* (affirming judgment in favor of prison doctor because there was no evidence that the delays between the initial visit, diagnosis, and specialist visit were within the doctor's control).

Randle contends that Dr. Aguinaldo was deliberately indifferent by failing to order additional x-rays and CT scans of his neck and head. [178] at 10. The record does not support a finding that Dr. Aguinaldo's decision to forgo ordering additional x-rays or CT scans of his head and neck was a substantial departure from accepted

---

[11] Randle says Nurse Wendy, a dismissed defendant, "created the foundation to the inadequate conduct" of the Wexford defendants including calling Randle a "big baby" and downplaying his injury. [178] at 10. Nurse Wendy triaged Randle when he was first brought in to the health care unit. [180] ¶¶ 10–12; [182] ¶¶ 8–9. The remaining medical defendants are not liable for Nurse Wendy's conduct. Randle also points to Wexford's "track record of providing poor health services." [178] at 7–8. Wexford's previous settlements in cases involving inadequate medical care do not establish the requisite showing for individual liability in this case.

medical judgment. Dr. Aguinaldo testified that he saw Randle for his hunger strike and lower back pain. [180] ¶ 15. Dr. Aguinaldo says he did not order additional imaging because Randle never complained of any neck or head pain to him. [181] at 12. There's nothing in the record to show that Randle complained about neck or head pain at this examination. *See* footnote 4. Randle's assertion that Dr. Aguinaldo should have conducted additional imaging based on his fall three days earlier is essentially a disagreement with Dr. Aguinaldo's medical judgment. *See Estelle*, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). Without any medical expert testimony to suggest that this decision significantly departed from professional medical standards, no reasonable jury could find that Dr. Aguinaldo's decision to forgo additional imaging was "blatantly inappropriate." *See Pyles*, 771 F.3d at 411.

Randle argues that Dr. Aguinaldo and the other Wexford defendants were deliberately indifferent by failing to implement Wexford's concussion protocol. *See* [178] at 14–15. A medical professional's deviation from standard protocol may be probative of their knowledge of risk of harm. *See Petties*, 836 F.3d at 729 ("While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm."). But Randle fails to establish

how each defendant departed from the concussion protocol. P.A. Williams described
the concussion protocol broadly, [155-3] at 34:3–21 (cleaned up):

> Q. If you suspect someone might have a concussion, what would you do, Ms.
> Williams?
>
> A. I mean first and foremost besides getting the history from the patient,
> you do a physical assessment, and from there you formulate your
> assessment or your diagnosis and then you proceed from there. As I said,
> initially the patient comes in contact with either the med tech or a nurse
> for an initial assessment, and we go from there. You asked about a protocol.
> Our protocols and procedures we do have a manual that's there for our use
> in case we need to refer to it. It is not set in stone that we need to follow
> those procedures and protocols. We basically rely on our medical knowledge
> and experience in how to proceed with that patient.
> …
> Q. If an inmate falls from his top bunk, do you know if he needs to be taken
> out by a stretcher?
>
> A. Each patient and situation is assessed on its individual merit, so there
> is no cookie-cutter process, so to speak. You have to evaluate each
> individual situation on its own merit.

Williams's testimony suggests that protocol after an inmate's fall is flexible and case
dependent. Without any evidence to suggest that Dr. Aguinaldo was departing from
the concussion protocol (or other accepted medical judgment) by failing to conduct a
more comprehensive physical examination, Randle cannot establish deliberate
indifference. Randle cites to *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015), for the
proposition that a defendant cannot evade liability by "refus[ing] to verify underlying
facts that [they] strongly suspect[] to be true." In *Conley*, the court found there was
sufficient evidence to create a material factual dispute as to whether the doctor
suspected (and ignored) an inmate's fractured hand. *Id.* Treatment notes suggested
a serious injury including "severe" swelling, loss of function and mobility,
discoloration, and a description of the injury as "possible/probable fracture." *Id.*

There, the court found the nurse had "communicated information sufficient to lead [the doctor] to strongly suspect that [the inmate] had suffered a fracture." *Id.* Here, there's no evidence in the record that Randle or the nurse who triaged him communicated information to Dr. Aguinaldo that suggested a more serious injury. At worst, Dr. Aguinaldo's decision not to examine Randle's head and neck after the fall rises to the level of negligence, but the standard Randle must meet is one akin to criminal recklessness. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). No reasonable jury could find Dr. Aguinaldo to be deliberately indifferent to Randle's medical needs. Summary judgment is granted as to Dr. Aguinaldo.

P.A. Williams saw Randle on three separate occasions after the fall. [180] ¶¶ 17, 20, 25. At his first visit on July 9, Williams saw Randle for his hunger-strike physical. [180] ¶ 17. Randle reported low-back pain. *Id.* Williams conducted a physical examination and noted no acute distress. *Id.* Williams advised him to resume eating and referred Randle to the medical director. *Id.* Randle says that it was not until July 9 that Williams referred Randle to the medical director, which shows a delay in treatment. [178] at 13. But Williams referred Randle to the medical director on the same day she evaluated him. Any time between Randle's fall and her referral was not within Williams's control. Nor can Randle show that the delay exacerbated his condition or unnecessarily prolonged his pain. During Randle's second visit with Williams on July 16, Williams conducted a physical examination and hunger-strike physical. [180] ¶ 20. The physical examination was normal. *Id.* Williams referred Randle to the medical director. *Id.* Williams saw Randle again on August 22. [180]

¶ 25. Randle sought an outside appointment for his hernia and had a medical permit inquiry. *Id.* Randle's physical examination was normal. *Id.* Williams advised Randle of his appointment with an outside physician at UIC, his upcoming appointment with the medical director, and ordered him to return as needed. *Id.* Randle doesn't point out what was inadequate about Williams's treatment, other than that Williams "only referred [him] to the medical director." [178] at 14. There's no explanation of how this deviated from standard medical judgment and no indication from the record that Williams believed anything more was required. Summary judgment is granted as to Williams.

Dr. Okezie saw Randle twice after the fall. [180] ¶¶ 22, 24. Dr. Okezie first saw Randle on July 20 for back and neck pain. *Id.* ¶ 22. Here too, Randle says his treatment was delayed because he did not see Dr. Okezie until thirty days after his fall. [178] at 13. But this wasn't the first time Randle had an appointment to see medical staff; it happened to be the first time Dr. Okezie was scheduled to see Randle. Any delay in treatment wasn't attributable to Dr. Okezie. During the visit with Dr. Okezie, Randle had a normal physical exam, mild dehydration, and no hematoma, abrasions, or bruises. *Id.* Randle asserts that he told Dr. Okezie about a lump on his head after the fall and that Dr. Okezie ignored the problem and told him he would only assess the problem Randle was experiencing with his foot. [182] ¶ 12. While a court may not weigh issues of credibility, "documents or objective evidence may contradict the witness' story" and a plaintiff may not rely on unsupported statements that is "flatly refuted by the hard evidence proffered by the defendant." *Melton v.*

*Tippecanoe Cnty.*, 838 F.3d 814, 819 (7th Cir. 2016) (cleaned up). The medical notes show that Dr. Okezie assessed and treated Randle for more than just foot pain at this visit—he conducted a physical examination and found no hematoma, abrasions, or bruises. [180] ¶ 22. Whatever Dr. Okezie said to Randle, nothing suggests that the treatment Dr. Okezie actually provided was constitutionally inadequate. At Randle's second visit with Dr. Okezie, the doctor reviewed the result of the x-rays, which revealed degenerative disc disease. *Id.* ¶ 24. Dr. Okezie granted Randle medical permits for an extra mattress, low gallery, and a waist chain to accommodate Randle's complaints of pain. *Id.* Randle doesn't identify how Dr. Okezie's treatment was deficient at this second visit. And the results of the x-ray and Dr. Okezie's accommodations do not support a finding that his judgment was blatantly inappropriate. Summary judgment is granted as to Dr. Okezie.

Without any evidence of deliberate indifference by Dr. Aguinaldo, P.A. Williams, or Dr. Okezie, summary judgment is also granted to Wexford Health Sources, Inc. on Randle's request for injunctive relief.

### B.    IDOC Defendants

Randle brings a claim against Officers Terrell Pork and Ovidiu Botan and Warden Walter Nicholson for failure to provide him with adequate medical care. [191] at 7–11. Randle argues that the officers knew about the risk of the fall from placing him in a top bunk yet were deliberately indifferent to such risk by refusing to honor his low-bunk permit. His claim against the officers is based on their conduct before the fall. Randle also argues that he complained about his need for medical care to Warden Nicholson, but the warden ignored him. His claim against Nicholson is based

on the warden's inaction after the fall. The IDOC defendants do not dispute an objectively serious medical condition, but they argue that Randle failed to exhaust his administrative remedies, cannot show the requisite mental state, and that the officers are otherwise entitled to qualified immunity. [88] at 5–10.

### 1. *Administrative Exhaustion*

Randle filed an emergency grievance on June 30, 2018, describing his transfer to X-House, noncompliance with the low-bunk permit, and his fall from the top bunk. [196] ¶ 22; [191-1] at 188–89. Randle's emergency grievance was deemed a non-emergency, and Randle was required to go through the normal grievance procedure. [176] at 6. The normal grievance procedure does not permit direct appeals to the Administrative Review Board (ARB). *Id.* The IDOC defendants state that the ARB received one grievance related to Randle's allegations in this suit, but Randle failed to provide the requisite information (response from the counselor, grievance officer, and chief administrative officer). [190] ¶¶ 29–30. The ARB informed him of the need for additional information, but it did not receive a resubmission. *Id.* Randle does not dispute that he failed to properly submit the grievance through normal channels, but he argues that the normal process was unavailable to him. [191] at 11–13.

An inmate only needs to exhaust "available remedies, not remedies that are unavailable." *Jackson v. Esser*, 105 F.4th 948, 956–57 (7th Cir. 2024). A remedy may be "unavailable" if threats or intimidation by prison officials prevent an inmate from submitting a grievance out of fear for retaliation. *See Gooch v. Young*, 24 F.4th 624, 628 (7th Cir. 2022). Randle asserts that his previous grievances submitted through the normal process were ignored and that intimidation by a prison employee deterred

him from filing an internal grievance. *Id.* at 12. On this latter point, Randle asserts that Sergeant Parker threatened him while he was being escorted to X-House (on June 28, the day before his fall): "Randle you nasty mother fucker-All [*sic*] the favors me and Lt. Lang used to do for you when I was over in Delta House and you pull some shit like that on them- you bitch ass mother fucker- I got yo ass Randle – I got something for you… I got you – you watch mother fucker." [191] at 11. It is not clear from the record what Parker's threats were in response to. But accepting Randle's assertions about these events as true, Randle has shown a reasonable fear for possible retaliation if he submitted a grievance. Viewing inferences in Randle's favor, I find that Randle exhausted the administrative remedies made available to him.

### 2. *Warden Nicholson*

A prison official may be deliberately indifferent if they ignore an inmate's request for medical assistance. *Petties*, 836 F.3d at 729. Randle says Warden Nicholson knew about his request based on the emergency grievance submitted on June 30. Defendants argue that the warden delegated review of inmate grievances, so he lacked the requisite knowledge of Randle's request. [176] at 9. Courts in this district disagree on whether a prison official who delegates grievance review to subordinates may evade personal liability based on lack of knowledge. *Compare Ruiz v. Williams, No. 14-CV-02750*, 2018 WL 1469044, at *20 (N.D. Ill. Mar. 26, 2018) (granting summary judgment in favor of warden who relied on subordinates to review grievances) *and Johnson v. Wexford Health Sources Inc.*, No. 19 C 4993, 2024 WL 1283700, at *5 (N.D. Ill. Mar. 26, 2024) (expressing skepticism of such argument when the grievance bears the official's signature).

21

Accepting as true that Randle's grievance put Warden Nicholson on notice of his request for medical care, there's no dispute that Randle received immediate medical care after his fall and continued to receive follow-up care after he submitted the grievance. Randle was seen on July 1 by medical staff per the hunger strike protocol; he reported during this visit that he was on hunger strike due to being denied medical treatment. [180] ¶ 14. He was seen the next day by Dr. Aguinaldo who prescribed him an analgesic balm for his back and ordered a follow-up to review the results of the low-back x-ray. *Id.* ¶ 15. In total, he was seen by medical staff ten times after he submitted his grievance. *Id.* ¶¶ 14–24. A warden "is entitled to relegate to the prison's medical staff the provision of good medical care." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Warden Nicholson was entitled to leave Randle's medical care to the medical staff. Randle may have had issue with how he was being treated, but there's no dispute that medical staff were continuing to treat Randle after the fall. No reasonable jury could find that Nicholson was deliberately indifferent to Randle's request for medical treatment.

### 3.  *Officers Pork and Botan*

"A lower-bunk permit does not supplant [the] framework for Eighth Amendment claims." *Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017) (analyzing medical permits in the *Bivens* context). The court in *Marberry* found that an inmate did not have a viable Eighth Amendment claim against prison officials who failed to comply with his low-bunk permit that was issued for a brain tumor. *Id.* at 427–29. Critically, the inmate failed to sue the defendant responsible for bunk assignments. *See id.* at 427. The court rejected the assumption that "every…

employee is responsible, on pain of damages, for not implementing the decision of any other… employee." *Id.* Moreover, the existence of a low-bunk permit does not automatically "convey to any conscientious prison employee the existence of a serious medical condition, something that is *sine qua non* of an Eighth Amendment medical-care claim." *Id.* at 428. The court reasoned that "medical personnel issue lower-bunk directives for reasons that do not imply the existence of a 'serious' health problem." *Id.* In sum, it's not enough that a prison official knew about an inmate's medical permit and the underlying medical condition—there must be some evidence that the officials knew "the details, consequences, and appropriate accommodations." *Id.*

Officers Pork and Baton were not responsible for making bunk assignments— it's undisputed that the placement officer was solely responsible for those assignments. *See* [190] ¶¶ 19–20, 23. The parties don't discuss what specific role Botan had in Randle's cell transfer. *See* [190] ¶¶ 25–26; [196] ¶ 21. Pork oversaw inmate placements and transfers, but he was not authorized to move Randle without approval from the placement officer. [196] ¶¶ 16–18. But Pork admits he had the authority to temporarily place an inmate in the bullpen. *See id.* ¶ 19. And there's a factual dispute as to whether Pork checked with the placement officer to see if relocation was possible. *See* [190] ¶ 23. Unlike the defendants in *Marberry*, there's enough evidence to establish that Pork had the authority to accommodate Randle's permit and chose not to do so. But that's not enough. It establishes inaction on his part, but Randle must show that Pork ignoring his permit rose to the level of recklessness. And that requires something more than the existence of the permit—

Pork must have known why Randle had the low-bunk permit and that the medical reason for the permit made it obvious that it was a serious medical condition. *See Marberry*, 847 F.3d at 428 (finding that the inmate's statement to defendant that he had a brain tumor fell short of demonstrating a serious medical condition because a tumor "would not necessarily imply to every guard or warden the need for medical care").

There's no evidence in the record that Randle told either officer why he had a permit. Randle only asserts that he told Pork about the permit and that Pork responded that the permit "meant nothing." [196] ¶ 6. Even if Pork did his due diligence and investigated the validity of Randle's permit, the permit only indicates "Hernia" under the section for "Absolute Criteria for Low Bunk Permit." [191-1] at 424. None of the other criteria, for example, "Seizure Disorder" or "Wheelchair (Permanent/Temporary)" are checked. Nor are the boxes for age, BMI, or neuromuscular disease checked. *Id.* No reasonable jury could find that Officers Pork and Botan subjectively knew and disregarded the serious risk of harm posed by ignoring Randle's medical permit. Summary judgment is granted in favor of the officers.[12]

---

[12] Officers Pork and Botan are otherwise entitled to qualified immunity. Qualified immunity applies unless the officers violated a constitutional right clearly established at the time. *See Tousis v. Billiot*, 84 F.4th 692, 697 (7th Cir. 2023). The right cannot be defined at "too high a level of generality." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021). Randle says it was clearly established that forcing an inmate on the top bunk when it is likely he would suffer an injury violated the Eighth Amendment. [191] at 15. Randle does not identify any precedent that established "beyond debate" that prison guards violate the Eighth Amendment by refusing to honor an inmate's low-bunk permit. *See Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). In *Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688, 689 (7th Cir.

## VI. Conclusion

The Wexford defendants' motion for summary judgment, [153], is granted. The IDOC defendants' motion for summary judgment, [174], is granted. Enter judgment in favor of defendants and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: September 24, 2024

---

2013), the court found that a prison nurse could be deliberately indifferent by forcing an inmate to sleep in an upper bunk bed despite being put on notice that he suffered from back pain and could not climb into the upper bunk by himself. But in this case, there was nothing to put the officers on notice of a serious medical need that obviated accommodation.